UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED:   MAR 1 7 2017
```

Presbyterian Healthcare Servs. *et al.*,

                                   Plaintiffs,

          —v—

Goldman Sachs and Co.,

                                   Defendant.

15-cv-6579 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

     Plaintiffs Presbyterian Healthcare Services and the New Mexico Hospital Equipment

Loan Council were investors in the Auction Rates Securities ("ARS") market and allegedly lost

over $10,000,000 when the ARS market crashed in 2008.  Like many ARS investors before

them, Plaintiffs have sued their financial advisor and the broker-dealer for their ARS, Goldman

Sachs and Co. ("Goldman Sachs"), alleging that Goldman Sachs wrongfully failed to disclose

material facts about the stability of the ARS market.  Before the Court is Goldman Sachs's

motion to dismiss Plaintiffs' amended complaint.  Because the Second Circuit Court of Appeals

has repeatedly rejected claims materially identical to the claims here, and because some of

Plaintiffs' causes of action are barred by the statute of limitations, the Court grants Goldman

Sachs's motion to dismiss.

## I.     Background[1]

     This lawsuit centers around Goldman Sachs's allegedly wrongful behavior in the ARS

market.  In order to understand the context of this lawsuit and the allegations in the amended

---

[1] The Court takes its facts from Plaintiffs' amended complaint, which the Court assumes is true for purposes of this Memorandum & Order.  *DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 147 (2d Cir. 2014).

complaint, some background information about the ARS market and 2008 collapse is necessary.

### A.    Auction Rate Securities

Auction Rate Securities, or "ARS," are debt instruments whose interest rate is reset at periodic auctions. Amend. Compl. ¶ 13 (Dkt No. 61); Def. Ex. 11 at 1 (Dkt No. 64-11); *Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 102 (2d Cir. 2012). These auctions that reset the ARS interest rate typically occur every seven, twenty-eight, or thirty-five days. Amend. Compl. ¶ 14. The auctions work as follows. At each auction, holders and buyers of ARS specify the minimum interest rate at which they are willing to hold or buy ARS. "If buy/hold orders meet or exceed sell orders, the auction succeeds. If supply exceeds demand, however, the auction fails and the issuer is forced to pay a higher rate of interest in order to penalize it and to increase investor demand." *Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333, 335 (2d Cir. 2011); Amend. Compl. ¶ 15. Prior to 2007, ARS were generally viewed as "safe, liquid" investments and a great way for debtors to maintain long-term debt obligations at short-term interest rates. *Anschutz*, 690 F.3d at 102 (quoting *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 123 (2d Cir. 2011)); Amend. Compl. ¶ 7. Consequently, the ARS market eventually attracted a number of unsophisticated investors. *Anschutz*, 690 F.3d at 102.

Like many large banking and investment firms, Goldman Sachs participated in the ARS market in multiple ways. For example, through its capacity as a financial advisor, Goldman Sachs would sometimes recommend that its clients enter the ARS market. Amend. Compl. ¶¶ 7, 70. Goldman Sachs also served as an underwriter for issuers who wished to raise cash through the use of ARS. Amend. Compl. ¶¶ 7, 70; *see Wilson*, 671 F.3d at 124. Furthermore, Goldman Sachs received a fee for acting as the broker-dealer through which investors submitted auction orders. Amend. Compl. ¶¶ 57, 70; *Wilson*, 671 F.3d at 124. Importantly for purposes of this

case, broker-dealers such as Goldman Sachs frequently bid in their own ARS auctions. Amend. Compl. ¶ 17; *Wilson*, 671 F.3d at 124. This practice, known as "cover" or "support" bidding, would prevent auction failures from occurring, making the ARS market appear more lucrative and stable than it actually was. Amend. Compl. ¶ 17; *Wilson*, 671 F.3d at 124.

### B.   The 2006 SEC Order and The Resulting Disclosures From Goldman Sachs

In 2004, the SEC started investigating several ARS broker-dealers, including Goldman Sachs. Amend. Compl. ¶¶ 42 & n.4, 60; *Wilson*, 671 F.3d at 125. The investigation concluded on May 31, 2006, when the SEC issued an "Order Instituting Administrative and Cease–and–Desist Proceedings, Making Findings, and Imposing Remedial Sanctions and a Cease–and–Desist Order Pursuant to Section 8A of the Securities Act of 1933 and Section 15(b) of the Securities Exchange Act of 1934" (the "2006 SEC Order"). *Wilson*, 671 F.3d at 125; Def. Ex. 11 at 3.[2]

In this 2006 order, the SEC concluded that broker-dealers, including Goldman Sachs, had violated securities law through their cover bidding practices in the ARS market. While the SEC did not conclude that the practice of cover bidding itself was illegal, the SEC did conclude that broker-dealers were violating the law by engaging in the practice without adequate disclosures. 2006 SEC Order at 5-9 & n.6; *Anschutz*, 690 F.3d at 103 & n.3; *Wilson*, 671 F.3d at 125. The SEC order required several broker-dealers, including Goldman Sachs, to pay a $1,500,000 fine. 2006 SEC Order at 9. It also required the broker-dealers to make certain disclosures. Specifically, the order required Goldman Sachs (and other broker-dealers) to "at all times make a description of its then-current material auction practices and procedures available to (1) all customers and broker-dealers who are participating through [Goldman Sachs] in an auction of

---

[2] This Order is publicly available at https://www.sec.gov/litigation/admin/2006/33-8684.pdf.

auction rate securities on the portion of its website that is accessible to such customers and broker-dealers and is related to such auction and (2) the general public on another portion of its website accessible to the general public." *Id.* at 11. These disclosures were to be made no later than three months after the date of the order. *Id.*

To comply with this order, Goldman Sachs created its "Material Auction Practices and Procedures" ("MAPPS"). This list of disclosures was distributed to investors and publically posted on Goldman Sachs's website. Amend. Compl. ¶¶ 42 n.4, 60; *Ashland*, 652 F.3d at 338 n.4. Several of the disclosures related specifically to the practice of cover bidding. Those disclosures included the following statements:

- "Goldman Sachs generally submits orders to sell all of its Auction Rate Securities in each Auction and may also submit Bid Orders."
- "Goldman Sachs is permitted, but not obligated, to submit Orders in Auctions for its own account either as a Bidder or a seller and routinely does so in the Auction Rate securities market in its sole discretion. We may make multiple Bids for our own account provided that each Bid is at a market rate."
- "While we are not obligated to do so, we routinely place one or more Bids in an Auction for our own account to acquire the securities for our inventory or to prevent an Auction from failing or clearing at a Rate that we believe does not reflect the market for the securities."
- "Bids by Goldman Sachs . . . are likely to affect (i) the Auction Rate . . . and (ii) the allocation of securities being auctioned . . . Because of these practices, the fact that an Auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk. We are not obligated to continue to place such Bids or encourage others to bid in any particular Auction to prevent an Auction from failing . . . Investors and issuers should not assume that we will do so or that Failed Auctions will not occur. Investors should also be aware that Bids by us or those we may encourage to place Bids may cause lower Rates to result."

Def. Ex. 11 at 5-6. These disclosures mirror, and sometimes use identical language as, the disclosures of other broker-dealers also subject to the 2006 SEC order. *Compare Wilson*, 671 F.3d at 125-26 (outlining Merrill Lynch's disclosures pursuant to the 2006 SEC Order); *Ashland*, 652 F.3d at 336 (outlining Morgan Stanley's disclosures pursuant to the 2006 SEC Order).

## C.    Presbyterian's Purchase of ARS

Plaintiff Presbyterian is a private, nonprofit healthcare system and provider located in

New Mexico.  Amend. Compl. ¶ 1.  Plaintiff New Mexico Hospital Equipment Loan Council is

an independent instrumentality of the State of New Mexico that allows health care organizations,

such as Presbyterian, access to capital markets for debt purposes.  Amend. Compl. ¶ 2.[3]

In 2003, Presbyterian contacted Goldman Sachs for help "evaluating its future capital

needs and its existing debt portfolio."  Amend. Compl. ¶ 29.  In November 2003, Goldman Sachs

provided an investment bank services proposal to Presbyterian.  Amend. Compl. ¶ 30.  Over the

next few months, Goldman provided several additional presentations to Presbyterian.  Amend.

Compl. ¶ 31.  Based on these presentations, Presbyterian engaged Goldman Sachs as their

"strategic capital advisor" in 2004.  Amend. Compl. ¶ 33.

Goldman Sachs recommended that Presbyterian borrow money through the issuance of

ARS.  Amend. Compl. ¶ 35.  Presbyterian followed this advice, and in May 2004, ARS totaling

$147,485,000 were issued to Presbyterian.  Amend. Compl. ¶ 36.  According to Presbyterian,

"[a]s the sole underwriter and Presbyterian's strategic capital advisor, Goldman influenced

almost every aspect of the transaction, including the structure, initial rates and the maximum rate

on the issuance."  Amend. Compl. ¶ 38.  Goldman Sachs and Citigroup Global Markets Inc. were

designated as the broker-dealers.  Amend. Compl. ¶ 36.  In connection with this transaction, the

parties entered into a "Broker-Dealer Agreement" ("BDA"), which set forth Goldman Sachs's

duties as broker-dealer for Presbyterian's ARS.  Amend. Compl. ¶¶ 79, 81; Def. Ex. 4 (Dkt No.

64-4); Mot. at 4 (Dkt No. 63).

In 2006, Goldman Sachs recommended that Presbyterian enter into "a series of interest

---

[3] To maintain consistency with the briefing of the parties, the Court refers to the plaintiffs simply as "Presbyterian."
*See* Mot. at 18; Opp. at 1 (Dkt No. 68).

rate swaps." Amend. Compl. ¶ 40.  Goldman Sachs recommended the swaps in order to "potentially hedge against a general rise in interest rates" for ARS.  Amend. Compl. ¶ 42. Goldman Sachs advised Presbyterian that entering into the swaps would establish a fixed rate for Presbyterian's ARS payments.  Amend. Compl. ¶ 40.  These swaps were entered into in February 2006, with an effective date of January 1, 2007.  Amend. Compl. ¶ 40.  Goldman Sachs continued to serve as broker-dealer of Presbyterian's ARS through 2008.  Amend. Compl. ¶ 39.

In late 2007 and early 2008, the ARS market collapsed.  Amend. Compl. ¶¶ 64, 66; *Anschutz*, 690 F.3d at 102.  A number of auction failures started to occur, which scared investors out of the market.  Amend. Compl. ¶ 64.  Initially, broker-dealers such as Goldman Sachs continued to submit cover bids, which led to a "rapid" rise in their ARS inventory.  Amend. Compl. ¶ 64, 66.  Eventually, Goldman Sachs's ARS inventory got too high, and in February 2008 the company decided to stop bidding in ARS auctions entirely.  Amend. Compl. ¶ 67.  As a result, even more ARS auctions failed, and eventually the entire market collapsed.  Amend. Compl. ¶ 67.

As a result of the ARS market collapse, the interest rate on Presbyterian's ARS rose dramatically.  Amend. Compl. ¶ 68.  The nonprofit was forced to refinance its bonds at a substantially higher fixed interest rate.  Amend. Compl. ¶ 68.  According to Presbyterian, they "were only able [to] extricate themselves from the ARS market at cost of over $10,000,000." Amend. Compl. ¶ 11.

### D.    Procedural History

On February 10, 2014, Presbyterian filed a claim against Goldman Sachs with the Financial Industry Regulatory Authority ("FINRA"), a non-governmental agency that regulates the securities industry.  Mot. at 8; Opp. at 15 (Dkt No. 68); *Presbyterian Healthcare Servs. v.*

*Goldman, Sachs & Co.*, 122 F. Supp. 3d 1157, 1166 & n.4 (D.N.M. 2015).  Among other things, Presbyterian alleged that Goldman Sachs had violated various securities and other laws by "misrepresent[ing] the stability of the ARS market" and, through the practice of cover bidding, "creat[ing] the illusion" of a stable market.  *Presbyterian Healthcare Servs.*, 122 F. Supp. 3d at 1166.  Around the same time, Presbyterian filed a complaint in the United States District Court for the District of New Mexico.  *Id.* at 1168.  Presbyterian sought to force Goldman Sachs to arbitrate Presbyterian's claims.  *Id.*

Goldman Sachs sought to enjoin the FINRA action and moved to transfer the case to the United States District Court for the Southern District of New York.  Mot. at 9; *Presbyterian Healthcare Servs.*, 122 F. Supp. 3d at 1170-72.  The company relied upon the BDA Presbyterian had signed when it entered the ARS market, which had set forth Goldman Sachs's duties as broker-dealer for Presbyterian's ARS.  *Presbyterian Healthcare Servs.*, 122 F. Supp. 3d at 1170.  The BDA contained an exclusive forum-selection clause stating "that all actions and proceedings arising out of this Broker-Dealer Agreement or any of the transactions contemplated hereby shall be brought in the United States District Court in the County of New York."  Def. Ex. 4 at 14; *see also Presbyterian Healthcare Servs.*, 122 F. Supp. 3d at 1166.  The district court in New Mexico agreed with Goldman Sachs, and the case was transferred to this Court on August 20, 2015.  Dkt Nos. 42-43; *Presbyterian Healthcare Servs.*, 122 F. Supp. 3d at 1214.

On May 18, 2016, Presbyterian filed an amended complaint.  Dkt No. 61.  On May 20, 2016, Goldman Sachs filed a motion to dismiss the amended complaint.  Dkt No. 62.  The Court subsequently issued a *sua sponte* order granting Presbyterian leave to amend its complaint in response to the motion to dismiss.  Dkt No. 65.  This order explicitly warned Presbyterian that "declining to amend their pleadings to timely respond to a fully briefed argument in the

Defendant's May 20, 2016, motion to dismiss may well constitute a waiver of the Plaintiff's right to use the amendment process to cure any defects that have been made apparent by the Defendant's briefing." Dkt No. 65. Presbyterian declined to amend its complaint, instead filing an opposition to the motion to dismiss. Dkt No. 68. The Court now resolves the motion.

## II.    Standard of Review

When deciding a motion to dismiss, the Court must accept all allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party. *Ashland*, 652 F.3d at 337. "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Regardless of the amount of factual matter included in the complaint, the Court must grant a motion to dismiss when the plaintiff's allegations, even if true, do not state a plausible claim of relief. *See Boddie v. Schnieder*, 105 F.3d 857, 860 (2d Cir. 1997).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). Here, the Court has relied on the facts alleged in the complaint, the Broker-Dealer Agreement between the parties, the 2006 SEC Order, and Goldman Sachs's SEC-mandated disclosures (i.e., the "MAPPS"). Reliance on the Broker-Dealer Agreement, 2006 SEC Order, and Goldman Sachs's disclosures is warranted because the plaintiffs rely upon these documents in their complaint. *See* Amend. Compl. ¶¶ 42 & n.4, 60, 79, 81; *see Chambers v. Time Warner*, 282 F.3d 147, 152-53 (2d Cir. 2002).

8

### III.  Discussion

Presbyterian's amended complaint asserts four causes of action: (1) fraud, (2) breach of contract, (3) breach of the implied covenant of good faith and fair dealing, and (4) unjust enrichment.  The allegations at the core of all four causes of action are the same.  According to Presbyterian, Goldman Sachs wronged the nonprofit by concealing and affirmatively misrepresenting the unstable nature of the ARS market.  In Presbyterian's view, Goldman Sachs failed to disclose two crucial facts.  First, Presbyterian alleges that Goldman Sachs failed to disclose the extent of its practice of cover bidding and how this practice affected the ARS market.  Specifically, Presbyterian alleges that, if Goldman Sachs had not bid in its own auctions, many ARS auctions would have failed.  Amend. Compl. ¶¶ 17-18.  By bidding in essentially every ARS auction, however, Goldman Sachs prevented many auction failures, thereby making it appear as if ARS were more in demand and stable than they actually were.  *See* Amend. Compl. ¶ 18.  Presbyterian contends that the ARS market "was really fictitious," *see* Opp. at 1, but that Goldman Sachs's practice of cover bidding concealed this fact and misled investors into falsely believing the ARS market was "stable, liquid and efficient."  Amend. Compl. ¶ 18.  Second, Presbyterian alleges that Goldman Sachs knew the ARS market was deteriorating as early as the fall of 2007 but failed to disclose this information to Presbyterian.  Amend. Compl. ¶¶ 64-65.  Presbyterian alleges that Goldman Sachs not only wrongfully failed to disclose this fact, but also affirmatively misrepresented that Presbyterian's ARS were performing well and that the ARS market was healthy.  Amend. Compl. ¶ 75.

According to Presbyterian, these wrongdoings caused the nonprofit serious financial injury.  Presbyterian alleges that if it had "known that the ARS market was wholly dependent on Goldman's support bids" and that without the bidding "the market would collapse," the nonprofit

would have never chosen to issue ARS in the first place.  Amend. Compl. ¶ 74.  Furthermore,

Presbyterian alleges that if Goldman Sachs had disclosed its "ever-increasing concerns about the

safety and viability of the Auction Rate market" in 2007, Presbyterian "would have chosen to

exit the ARS structure while attractive financing was still available."  Amend. Compl. ¶ 74.

Instead, because Goldman Sachs concealed this information and affirmatively misrepresented the

safety of the ARS market, Presbyterian did not exit the market before the collapse, which caused

the nonprofit to lose millions of dollars.  Amend. Compl. ¶ 11.

      Goldman Sachs's motion to dismiss raises two overarching arguments.  First, Goldman

Sachs argues that the vast majority of Presbyterian's claims are barred by Second Circuit

precedent.  Mot. at 10-20.  Goldman Sachs relies on multiple cases decided in the wake of 2008

ARS market collapse, in which the Second Circuit resoundingly rejected claims brought by ARS

investors against their broker-dealers.  *See, e.g.*, *Anschutz Corp. v. Merrill Lynch & Co.*, 690

F.3d 98 (2d Cir. 2012); *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120 (2d Cir. 2011);

*Ashland Inc. v. Morgan Stanley & Co., Inc.*, 652 F.3d 333 (2d Cir. 2011).  Second, Goldman

Sachs alleges that Presbyterian's claims are barred by the statute of limitations.  Mot. at 20-25.

As explained below, the Court agrees with Goldman Sachs on both grounds and accordingly

dismisses the amended complaint.

### A.    Presbyterian's Fraud Claim is Barred by Second Circuit Precedent Such as *Ashland*, *Wilson*, and *Anschutz*

      Presbyterian alleges that Goldman Sachs committed fraud by failing to disclose that

(1) that the ARS market was propped up by Goldman Sachs's practice of cover bidding and that

in reality, the ARS market was "an artificial market that was completely opaque" and (2) "the

market for ARS was deteriorating substantially in the fall of 2007 and early 2008."  Opp at. 1-2.

Goldman Sachs counters that these allegations are barred by Second Circuit precedent that has

rejected similar claims brought by ARS investors against their broker-dealers. Mot. at 10-20.

After the ARS market collapsed in 2007 and 2008, multiple investors brought lawsuits against their broker-dealers.[4]  In general, these lawsuits alleged that various broker-dealers, including Merrill Lynch, Morgan Stanley, JP Morgan, and Citigroup, violated the law by concealing their practices of cover bidding and the effect it had on the market. *See, e.g.*, *Anschutz*, 690 F.3d at 107-08; *Finn v. Barney*, 471 F. App'x 30, 34 (2d Cir. 2012); *Wilson*, 671 F.3d at 124; *Ashland*, 652 F.3d at 336; *In re JP Morgan Auction Rate Securities (ARS) Marketing Litig.*, No. 10 MD 2157(PGG), 2014 WL 4953554, at *3 (S.D.N.Y. Sept. 30, 2014). The Second Circuit has repeatedly rejected these lawsuits, holding in essence, that the disclosures broker-dealers made pursuant to the 2006 SEC Order barred any claim of fraud or market manipulation. *See, e.g., Louisiana Pacific Corp. v. Merrill Lynch & Co., Inc.*, 571 F. App'x 8, 10-11 (2d Cir. 2014*); Cellular South Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 516 F. App'x 30, 33 (2d Cir. 2013); *Anschutz*, 690 F.3d at 108-10; *Finn*, 471 F. App'x at 33-34; *Wilson*, 671 F.3d at 129-36; *Ashland*, 652 F.3d at 337-39.  In *Ashland*, the Second Circuit held that, in light of the SEC-mandated disclosures made by broker-dealer Morgan Stanley, an ARS investor could not have reasonably relied on any alleged misrepresentations or omissions. 652 F.3d at 338.  In *Wilson* and *Anschutz*, the Court appeared to go further, holding that the SEC-mandated disclosures were sufficient to bar the claim that the broker-dealers had made any misrepresentations in the first place. *Anschutz*, 690 F.3d at 108-10; *Wilson*, 671 F.3d at 132-36.

Presbyterian's fraud allegations are essentially identical to the claims already rejected in *Ashland*, *Wilson*, and *Anschutz*.  Just like the plaintiffs in those three cases, Presbyterian is an

---

[4] *See, e.g., Louisiana Pacific Corp. v. Merrill Lynch & Co., Inc.*, 571 F. App'x 8 (2d Cir. 2014); *Cellular South Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 516 F. App'x 30 (2d Cir. 2013); *Anschutz*, 690 F.3d 98; *Finn*, 471 F. App'x 30; *Wilson*, 671 F.3d 120; *Ashland,*, 652 F.3d 333; *In re JP Morgan Auction Rate Securities (ARS) Marketing Litig.*, Nos. 10 MD 2157(PGG), 10 Civ. 4552(PGG), 2014 WL 4953554, *1 (S.D.N.Y. Sept. 30, 2014).

investor in the ARS market who is suing its broker-dealer. As the plaintiffs did in *Ashland*, *Wilson*, and *Anschutz*, Presbyterian alleges that Goldman Sachs committed fraud by failing to disclose the extent of its cover bidding practices and how this practice artificially bolstered the market for ARS. *Anschutz*, 690 F.3d at 108-10; *Wilson*, 671 F.3d at 124; *Ashland*, 652 F.3d at 338.

The reasoning of *Anschutz*, *Wilson*, and *Ashland* bar Plaintiffs' fraud claim here. As in those cases, the SEC-mandated disclosures for Goldman Sachs, Merrill Lynch, and Morgan Stanley all stated that the broker-dealer was "permitted, but not obligated, to submit Orders in Auctions for its own account either as a Bidder or a seller" and that each company "routinely does so in its sole discretion." Def. Ex. 11 at 5; *Anschutz*, 690 F.3d at 104; *Wilson*, 671 F.3d at 126; *Ashland*, 652 F.3d at 336. Similarly, the disclosures for all three broker-dealers stated essentially that "the fact that an Auction clears successfully does not mean that an investment in the securities involves no significant liquidity or credit risk." Def. Ex. 11 at 6; *Anschutz*, 690 F.3d at 104; *Wilson*, 671 F.3d at 126; *Ashland*, 652 F.3d at 336. The Goldman Sachs disclosure, like the disclosures from Merrill Lynch and Morgan Stanley, explicitly warned that the company was "not obligated to continue to place [cover] Bids . . . to prevent an Auction from failing" and that "[i]nvestors and issuers should not assume that [the broker-dealer] will do so or that Failed Auctions will not occur." Def. Ex. 11 at 6; *Anschutz*, 690 F.3d at 104; *Wilson*, 671 F.3d at 126; *Ashland*, 652 F.3d at 336. Because the Second Circuit has already held that these precise disclosures were sufficient to bar any market manipulation or fraud claim brought by an ARS investor against its broker-dealer, Presbyterian is unable to state a fraud claim against Goldman Sachs.[5]

---

[5] Presbyterian's amended complaint appears to admit that the nonprofit received a copy of these disclosures. Amend. Compl. ¶ 42 n.4. Even if Goldman Sachs did not personally give Presbyterian a copy, the disclosures

Presbyterian makes many arguments as to why these Second Circuit cases are distinguishable.  As explained below, the Court finds none of these arguments persuasive.

First, Presbyterian brings only a state law fraud claim under New York law,[6] as opposed to a market manipulation claim under the Securities Exchange Act.  *See* Amend. Compl. ¶¶ 72-77.  It is true that the reasoning of *Wilson* and *Anschutz* focused on federal securities fraud claims under § 10(b) and Rule 10b–5 of the Securities Exchange Act.  *Anschutz*, 690 F.3d at 108-10; *Wilson*, 671 F.3d at 129-136.  However, in both *Ashland* and *Anschutz*, the Second Circuit affirmed the dismissal of both federal securities law *and* New York common law fraud claims.  *Anschutz*, 690 F.3d at 110 n.15; *Ashland*, 652 F.3d at 339.  Misrepresentation and reasonable reliance are elements of both a federal market manipulation claim and a New York common law fraud claim.  *See Wilson*, 671 F.3d at 130; *Crigger v. Fahnestock and Co., Inc.*, 443 F.3d 230, 234 (2d Cir. 2006).   Thus, by finding that the plaintiffs could not show misrepresentation or reasonable reliance, the Second Circuit's reasoning in these three cases doomed both securities claims under federal law and common law fraud claims under New York law.

Second, Presbyterian argues that the nondisclosures at issue in this case differ from the nondisclosures challenged in *Ashland*, *Wilson*, and *Anschutz*.  According to Presbyterian, the plaintiff-investors in those three cases alleged that they "were unaware that broker-dealers bid in auctions."  Opp. at 3.   Here, in contrast, Presbyterian admits it was aware of the general practice of cover bidding but argues instead that Goldman Sachs committed fraud by failing to disclose

---

would still foreclose Presbyterian's fraud claim because "the [disclosure] statement was also available online, and [Presbyterian] could have easily discovered it through minimal diligence." *Ashland*, 652 F.3d at 338 n.4.

[6] Defendants contend that New York law applies in this diversity action, *see* Mot. at 11 n.9, while Plaintiffs do not address the issue.  For two reasons, the Court applies New York law when analyzing the viability of Plaintiffs' four state law causes of action.  First, the BDA governing Presbyterian and Goldman Sachs's broker-dealer relationship states that "[t]his Broker-Dealer Agreement shall be governed by and construed in accordance with the laws of the State of New York." Def. Ex. 4 at 14.  Second, Plaintiffs have consented to the application of New York law by relying on New York law in their opposition to the motion to dismiss.  Opp. at 5-8 & n.3; *see Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014).

the *extent* of its cover bidding practices and how that bidding affected the ARS market.  Opp. at

3, 10; Amend. Compl. ¶¶ 43, 74.  According to Presbyterian, Goldman Sachs's disclosures were

fraudulent and misleading because they failed to disclose that, in reality, Goldman Sachs was

bidding in every single one of its own auctions.  Opp. at 3, 10.

    Presbyterian misrepresents the breadth of the Second Circuit decisions, and the Second

Circuit already rejected the nonprofit's precise argument.  For example, in *Wilson*, the plaintiff-

investors argued that even if the Court found that Merrill Lynch had adequately disclosed the

fact that it submitted cover bids, the broker-dealer nonetheless committed fraud by failing to

adequately disclose the extent of that practice.  671 F.3d at 132.  According to the *Wilson*

plaintiffs, Merrill Lynch's disclosures "were incomplete and misleading" because "Merrill

[Lynch] did not periodically or even 'routinely' submit [cover bids]," but rather submitted cover

bids "as a matter of course in every single auction."  *Id.* at 131-32.  This is the precise allegation

Presbyterian makes here.  *See* Opp. at 3 ("[Goldman Sachs's] disclosures did not address the

reality that Goldman knew at the time that not only 'could' Goldman bid in auctions, but as a

matter of practice, Goldman did bid in every single auction where it was the lead broker-dealer

(like it was for Plaintiff's ARS) and that, but for that 'cover bidding' practice, more than half of

the ARS would fail, including Presbyterian's ARS.").

    The Second Circuit rejected the plaintiff-investors' argument in *Wilson*, explaining:

> [W]e we do not see how [this] allegation can be actionable given Merrill's disclosure that
> it "may routinely" place such bids. Merrill's statement that it "may routinely" place
> support bids is not inconsistent with the possibility that it would place such bids in every
> Merrill ARS auction that took place over a particular period. While Wilson reads the
> word "may" as speaking to the likelihood that Merrill would place support bids, an
> investor could more easily understand the word as disclosing merely that Merrill was
> permitted, but not required, to place bids for its own account to prevent an auction from
> failing . . . And the word "routinely," which has been defined to mean "of a
> commonplace or repetitious character," is consistent with the frequency of intervention
> that Wilson alleges.

*Id.* at 133. The Court in *Wilson* accordingly concluded that Merrill Lynch's SEC-mandated disclosures "fairly disclosed" that the broker dealer could "place support bids in every single auction unless it decided to let certain auctions fail or withdraw from the market altogether." *Id.* As explained previously, Goldman Sachs disclosures were materially identical to the disclosures found sufficient to bar the lawsuit in Merrill Lynch. The reasoning of *Wilson* therefore also bars Presbyterian's claim that Goldman Sachs's disclosures were misleading regarding the frequency of cover bids. *See id*; *see also In re JP Morgan Auction Rate Securities (ARS) Marketing Litig.*, 2014 WL 4953554, *10 (noting that "the Second Circuit's decision in *Wilson v. Merrill Lynch & Co.* . . . rejected plaintiff's argument that disclosures made by Merrill Lynch . . . 'were incomplete and misleading because they failed to apprise investors of the extent to which the market for Merrill ARS was dependent on Merrill's continued placement of support bids'" (quoting *Wilson*, 671 F.3d at 132)).

Third, Presbyterian argues that its amended complaint is distinguishable from the allegations in these Second Circuit cases because Goldman Sachs's disclosures were developed *after* Presbyterian first purchased ARS. Opp. at 3, 11. As mentioned previously, Goldman Sachs's disclosures were developed after the SEC's May 31, 2006 cease-and-desist order. Here, Presbyterian alleges that it first purchased ARS in 2004. Amend. Compl. ¶¶ 7, 35-36; Opp. at 3.

Once again, Presbyterian ignores the breadth of the Second Circuit's ARS decisions, as that Court has already rejected this precise attempt at distinction. In *Anschutz*, the Court relied on *Wilson* to dismiss an ARS investor's complaint against its broker-dealer. *Anschutz*, 690 F.3d at 108-10. In doing so, the Court noted that the plaintiff in that case had made one of his ARS purchases before the 2006 disclosures, a fact the Second Circuit admitted was a "wrinkle . . . not

present in *Wilson*." *Id.* at 110. The Court nonetheless affirmed dismissal of the plaintiff-

investor's claims. *Id.* at 115. The Court explained:

> [The] auctions involving the relevant ARS continued for a full year after Merrill Lynch
> posted the Website Disclosure in August 2006. At each of these auctions, Anschutz had
> the option to buy, sell, or hold the ARS at issue. By that time, Anschutz was fully
> informed of Merrill Lynch's ARS practices, and still decided to hold.

*Id.* at 110. In other words, by continuing to hold ARS even after Goldman Sachs's 2006

disclosures, Presbyterian has forfeited any fraud claim premised on pre-2006 purchases of ARS.

Finally, Presbyterian alleges that its amended complaint is distinguishable from *Ashland*,

*Wilson*, and *Anschutz* because Presbyterian challenges not only Goldman Sachs's failure to

disclose its cover bidding practices, but also the company's failure to disclose "the deteriorating

market conditions for ARS in the Fall of 2007." Opp. at 3. According to Presbyterian, Goldman

Sachs knew about "increasing risks" associated with the ARS market in 2007 and committed

fraud by failing to disclose this fact to Presbyterian. Opp. at 11.

There are two problems with this argument. First, yet again, the Second Circuit has

rejected it. In *Wilson*, the plaintiff-investors made an almost identical argument, alleging that

Merrill Lynch should be held liable for failing to disclose its knowledge that "the market for

ARS was under increasing stress" and "that the ARS market was 'collapsing' and that issuers

'would be best served by exiting the market.'" 671 F.3d at 131 n.6 (alterations omitted). The

Second Circuit concluded that these allegations failed to state a claim of relief, explaining:

> [T]o the extent that Wilson's complaint includes allegations that Merrill knew that the
> ARS market was "unsustainable," that knowledge is not alleged to have arisen until "the
> fall of 2007," *i.e.*, after Wilson had purchased his ARS in July 2007, the credit market
> had deteriorated, and Merrill and other dealers had allowed some ARS auctions to fail.
> Taken together, these allegations do not support the inference that Merrill knew, *at the
> time of Wilson's purchase*, that the ARS market was certain to fail in the absence of its
> intervention.

*Id.* at 134 (internal citation omitted). The same reasoning applies here. Presbyterian alleges that

Goldman Sachs became aware of "the deteriorating market conditions for ARS in the Fall of 2007." Opp. at 3; *see also* Amend. Compl. ¶ 72.  But, like the plaintiff-investors in *Wilson*, Presbyterian purchased its ARS in 2004 and entered into a series of interest rate swaps in 2006. Amend. Compl. ¶¶ 36, 40, 44, 51, 57, 59.  Because Presbyterian makes no allegations that it made additional purchases after 2007, the point at which Goldman Sachs's allegedly knew about the pending market collapse, *Wilson* bars Presbyterian's claims.

Second, even if *Wilson* did not bar Presbyterian's claim that Goldman Sachs committed fraud by failing to disclose its knowledge of the deteriorating ARS market, the Court would nonetheless dismiss the claim for lack of particularity.  Under Federal Rule of Civil Procedure 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  "[I]n order to comply with Rule 9(b), the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (citation and quotation marks omitted).  Presbyterian's allegations regarding Goldman Sachs's failure to disclose the deteriorating ARS market conditions do not satisfy this standard.  The amended complaint repeatedly makes sweeping statements, such as "[b]eginning in the fall of 2007, the ARS market deteriorated significantly, a fact well known to Goldman, but not disclosed to Plaintiffs," *see* Amend. Compl. ¶ 64, and "Goldman did not disclose its ever-increasing concerns about the viability of the ARS market or the dramatically increasing risk in the ARS market," *see id.* ¶ 65.[7]

---

[7] Presbyterian's other allegations as to Goldman Sachs's fraudulent failure to disclose the declining ARS market conditions include: (1) "From August 2007 through February of 2008, Goldman became increasingly more concerned with the viability of the ARS market and considered withdrawing its support from the ARS market as early as September 2007. However, Goldman did not express these concerns to Plaintiffs nor the extreme deterioration of the market, but rather continued to represent that the ARS Bonds were performing as expected," Amend. Compl. ¶ 10; (2) "For months, Goldman and other broker-dealers, because of their role as marketer and ultimately market-maker, knew that the ARS market was 'broken' and that they might soon exit the market,

The amended complaint also asserts that Goldman Sachs affirmatively misrepresented that the
ARS market was stable.  Amend. Compl. ¶ 75.  But Presbyterian's amended complaint never
identifies basic information, such as exactly when the misrepresentations and omissions
allegedly occurred, where they occurred, who within Goldman Sachs made the representations,
or the precise statements that were fraudulent.  Presbyterian's general allegation that Goldman
Sachs failed to disclose general market information at some unspecified time is insufficient to
survive Rule 9(b)'s heightened pleading standards for fraud.

In conclusion, Presbyterian's fraud claim against Goldman Sachs "fail[s] for the same
reason that nearly every other ARS-based securities fraud claim in this Circuit has failed: the
activity complained of was adequately disclosed to the market."  *In re JP Morgan Auction Rate
Securities (ARS) Marketing Litigation*, 2014 WL 4953554, at \*8.  Presbyterian's attempts to
distinguish cases like *Ashland*, *Wilson*, and *Anschutz* are unconvincing, as the Second Circuit has
explicitly considered and rejected each of Presbyterian's arguments.  The Court thus dismisses
Presbyterian's fraud claim for failure to state a claim upon which relief can be granted.

### B.      Presbyterian Fails to State a Plausible Breach of Contract Claim

In the second count of the amended complaint, Presbyterian brings a breach of contract
claim.  Amend. Compl. ¶¶ 78-83.  Presbyterian alleges that Goldman Sachs committed a breach
of contract in three ways.  The Court agrees with Goldman Sachs that all three of Presbyterian's

---

resulting in its total collapse. However, Goldman and the other underwriters and broker-dealers purposefully
withheld this information from issuers, such as Plaintiff," Amend. Compl. ¶ 19; (3) "Although Presbyterian was
paying Goldman to manage its auctions throughout this period, Goldman never discussed its own serious concerns
with Plaintiffs. To the contrary, despite being aware that the ARS market was weakening, Goldman continued to
affirmatively represent to Presbyterian that the ARS market and Plaintiffs' ARS in particular were performing fine,"
Amend. Compl. ¶ 64; (4) "[D]uring this time Goldman failed to disclose material information relating to its
concerns about the pending collapse of the ARS market in late 2007 and early 2008," Amend. Compl. ¶ 72; and (5)
"Goldman was well aware that Plaintiffs were relying on Goldman to provide accurate information about the ARS
market, and that Goldman was better positioned to have accurate information about their own bidding practices and
the deteriorating state of the ARS market than Plaintiffs. Goldman represented until the market collapsed that the
ARS market, and Plaintiffs' ARS in particular, were performing as expected," Amend. Compl. ¶ 75.

breach of contract arguments fail as a matter of law and must be dismissed.

       **1.**      **Goldman Sachs Did Not Breach the BDA By Failing to Comply With "Applicable Securities Law"**

Presbyterian first alleges that Goldman Sachs breached the section of the Broker-Dealer Agreement requiring Goldman Sachs to act "in accordance with its respective duties under applicable securities laws." Amend. Compl. ¶ 79. According to Presbyterian, by "failing to disclose material facts and misrepresenting th[e] status of the ARS market," Goldman Sachs violated applicable securities law and thereby also breached the BDA. *Id.*; *see also* Amend. Compl. ¶ 79 ("Not only were those material misrepresentations and omissions violations of securities laws, but they were also a breach of the contract between the parties."). In other words, this breach of contract claim rests on a conclusion that violations of the securities laws occurred. But the Second Circuit has already held, as explained above, that broker-dealers such as Goldman Sachs did not violate federal securities law through their cover bidding practices. Accordingly, Presbyterian cannot plausibly bring a breach of contract claim based on these alleged violations.

       **2.**      **Section 4.1 of the BDA Does Not Impose Disclosure Obligations on Goldman Sachs**

Next, Presbyterian alleges that Goldman Sachs breached § 4.1 of the BDA. Presbyterian alleges that this provision of the BDA required Goldman Sachs to convey to Presbyterian any "material adverse change" in the ARS market. Amend. Compl. ¶ 82. Parroting its fraud and other breach of contract claim, Presbyterian alleges that Goldman Sachs violated this provision by failing to disclose the "material changes in the ARS market in the fall of 2007 and early 2008." Amend. Compl. ¶ 82.

Section 4.1 states in full:

"SECTION 4. DISCLOSURE; INDEMNIFICATION

4.1     *Disclosure*

(a) The Company [Presbyterian] agrees to supply to BD [Goldman Sachs], at the Company's expense, such number of copies of the Official Statement, dated April 26, 2004, including any amendments thereto (the "Official Statement"), as BD shall reasonably request from time to time and, upon request of BD, to amend the Official Statement so that the Official Statement will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading.

(b) The Company shall promptly notify BD of any material adverse change in the affairs of the Company, financial or otherwise. If BD determines (upon consultation and mutual agreement with the Company) that it is necessary or desirable to use a disclosure statement (other than the Official Statement), relating specifically to the Series 2004 Auction Bonds (a 'Disclosure Statement') in connection with the solicitation of Orders for the Series 2004 Auction Bonds, BD will notify the Company, and the Company will provide BD with a Disclosure Statement reasonably satisfactory to BD and its counsel. The Company will supply BD, at the Company's expense, with such number of copies of such Disclosure Statement as BD requests from time to time and will, upon request of BD, amend such Disclosure Statement (as well as the documents incorporated by reference therein) so that such Disclosure Statement will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. In connection with the use of any Disclosure Statement by BD in its solicitation of Orders for the Series 2004 Auction Bonds (other than the Official Statement), the Company will furnish to BD such certificates, accountants' letters and opinions of counsel as would be customary in a public offering of tax-exempt securities underwritten by BD. In addition, the Company will, at its own expense, take all steps reasonably requested by BD that BD or its counsel may consider necessary or desirable to effect compliance with applicable federal or state securities law."

Def. Ex. 4 at 10.

Upon reading the provision, it is clear that § 4.1 imposes obligations on *Presbyterian*, not

Goldman Sachs, to disclose certain information. The purpose of the section appears to be to

ensure that Presbyterian's disclosures, as distinct from Goldman Sachs's, remain current. For

example, subsection (a) requires Presbyterian to provide Goldman Sachs a copy of the

nonprofit's "Official Statement." Similarly, the section requires Presbyterian to, upon Goldman

Sachs's request, amend its Official Statement in order to avoid the misstatement of material

20

facts.  Nowhere in § 4.1(a) does the BDA require Goldman Sachs to make disclosures.  To the extent § 4.1(a) places any obligations on Goldman Sachs, it is only that Goldman Sachs's requests for updates to Presbyterian's disclosures be "reasonable."

Section 4.1(b) similarly imposes obligations on Presbyterian, not Goldman Sachs.  For example, the section requires Presbyterian to "promptly notify [Goldman Sachs] of any material adverse change in the affairs of [Presbyterian], financial or otherwise."  Furthermore, the section requires Presybterian to, upon Goldman Sachs's request, provide a "Disclosure Statement" or amend that statement so that it "will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements . . . not misleading."  The section places further obligations on Presbyterian, requiring the nonprofit to provide Goldman Sachs copies of certain statements from their accountants and attorneys and to "take all steps reasonably requested by [Goldman Sachs]" in order to ensure that there is compliance with applicable securities law.  In short, just as in subsection (a), § 4.1(b) imposes obligations on *Presbyterian* to take certain acts, if Goldman Sachs so requests.  The subsection does not impose disclosure obligations on Goldman Sachs.

Presbyterian responds that § 4.1 contains an implied duty on Goldman Sachs to "inform Presbyterian of material facts in order to give Presbyterian an opportunity to update its disclosures."  Opp. at 20.  According to Presbyterian, Section 4.1 imposes "[m]utual communication and disclosure" requirements.  Opp. at 23.  But the Court cannot square this argument with the text of § 4.1.  Under New York law, "the plain language" of the contract controls.  *Karol v. Polsinello*, 8 N.Y.S.3d 447, 450 (N.Y. App. Div. 2015).  Nowhere in § 4.1 is there language requiring Goldman Sachs to disclose material adverse changes in the ARS market.  Rather, § 4.1 requires *Presbyterian* to update its disclosures if there are "any material

adverse change[s] *in the affairs of [Presbyterian],* financial or otherwise." Def. Ex. 4 at 10 (emphasis added).

In conclusion, because the plain language of § 4.1 imposes obligations only on Presbyterian to provide certain updated disclosures, and does not place any corresponding duty on Goldman Sachs, Presbyterian's second breach of contract argument must be dismissed.

### 3. The Merger Clause Forecloses Presbyterian's Breach of Contract Claim Premised on Goldman Sachs's Proposals

Finally, Presbyterian alleges that Goldman Sachs breached "its November 2003 proposal and subsequent proposals." Amend. Compl. ¶ 83. According to Presbyterian, Goldman Sachs promised in the proposals to support the ARS market through cover bids and then breached this promise by "suddenly and without warning, pull[ing] its bids." *Id.* The Court concludes that this allegation also fails to state a claim.

As an initial matter, the Court notes that this breach of contract claim contradicts the entirety of the rest of Presbyterian's amended complaint. The premise of Presbyterian's fraud and other breach of contract claims is that Goldman Sachs concealed the extent to which it was supporting the ARS market with cover bids. If Goldman Sachs did actually promise in its proposals that it would submit cover bids in order to support the ARS market, then Presbyterian would be unable to prevail on its fraud and breach of contract claims premised on Goldman Sachs's failure to disclose the extent of its cover bidding, as there would have been no nondisclosure. *See Ashland*, 652 F.3d at 337.

But even assuming that Presbyterian's factual allegations are true, as the Court must at this stage in the litigation, Presbyterian's breach of contract claim fails in light of the merger clause in the BDA. Under New York law, a subsequent contract (here, the BDA) supersedes any earlier promises or contracts (here, the November 2003 and other proposals) if "there is an

22

integration and merger clause that explicitly indicates that the prior provision is superseded."

*Marsh v. Cabrini Med. Ctr.*, No. 08 Civ. 5405 (RJS), 2009 WL 1726331, *3 (S.D.N.Y. Apr. 6,

2009); *see also Jia v. Intelli-Tech Sec. Servs, Inc.*, 981 N.Y.S.2d 79, 80-81 (N.Y. App. Div.

2014) (noting that any prior agreement "would have been superseded pursuant to the . . .

agreement's merger clause"). The BDA at issue in this case contains a merger clause.

Specifically, § 5.4 states that "Broker-Dealer Agreement, and the other agreements and

instruments executed . . . contain the entire agreement between the parties relating to the subject

matter hereof." Def. Ex. 4 at 13. It states further that "there are no other representations,

endorsements, promises, agreements or understandings, oral, written or inferred, between the

parties relating to the subject matter hereof." *Id.* In light of this merger clause, Presbyterian is

"foreclosed" from "rel[ying] upon any representation not contained in the [BDA]," such as the

representations allegedly made in the earlier proposals. *Jia*, 981 N.Y.S.2d at 81.

### C.   Presbyterian's Breach of the Covenant of Good Faith and Fair Dealing Claim is Dismissed as Redundant

Presbyterian's third cause of action is a breach of the implied covenant of good faith and

fair dealing claim. Amend. Compl. ¶¶ 84-85. The Court dismisses this count as duplicative of

the breach of contract claims.

"Under New York law, a duty of good faith and fair dealing is implied in every contract."

*Nat'l Market Share, Inc. v. Sterling Nat'l Bank*, 392 F.3d 520, 525 (2d Cir. 2004). New York,

however, "does not recognize a separate cause of action for breach of the implied covenant of

good faith and fair dealing when a breach of contract claim, based upon the same facts, is also

pled." *Harris v. Provident Life and Accident Ins. Co.*, 310 F.3d 73, 81 (2d Cir. 2002); *see also*

*Alaska Elec. Pension Fund v. Bank of America Corp.*, 175 F. Supp. 3d 44, 64 (S.D.N.Y. 2016)

("[A]n implied-covenant claim is not a valid alternative theory of recovery 'when [it is] based on

23

the exact same allegations' as a breach-of-contract claim, as it is here.") (alteration in original)

(quoting *Grant & Eisenhofer, P.A. v. Bernstein Liebhard LLP*, No. 14–CV–9839 (JMF), 2015

WL 1809001, at *4 (S.D.N.Y. Apr. 20, 2015)).  Consequently, a plaintiff's breach of the implied

covenant of good faith and fair dealing claim must allege facts that differ from the underlying

breach of contract claim.  *See ARI & Co., Inc. v. Regent Intern'l Corp.*, 273 F. Supp. 2d 518, 522

(S.D.N.Y. 2003) ("[A] breach of the implied covenant of good faith claim can survive a motion

to dismiss only if it is based on allegations different than those underlying the accompanying

breach of contract claim." (citation and quotation marks omitted)).  "[W]hen a complaint alleges

both a breach of contract and a breach of the implied covenant of good faith and fair dealing

based on the same facts, the latter claim should be dismissed as redundant." *Cruz v.*

*FXDirectDealer, LLC*, 720 F.3d 115, 125 (2d Cir. 2013).

 Presbyterian's breach of the duty of good faith and fair dealing claim is redundant of its

breach of contract claim.  Presbyterian alleges that Goldman Sachs violated the implied covenant

of good faith and fair dealing by "fail[ing] to disclose the realty [*sic*] of the ARS market to

[Presbyterian]," and more specifically, by failing to "disclose that, but for Goldman's 'propping up'

the ARS market, the ARS market would not exist."  Amend. Compl. ¶ 84.  Presbyterian also

alleges that Goldman Sachs "violated their obligation of good faith and fair dealing by not

disclosing to Plaintiffs the fragile state of the ARS market in the Fall of 2007 and early 2008."

Amend. Compl. ¶ 85.  These are the same alleged wrongful acts underlying Presbyterian's

breach of contract claim.  *See* Amend. Compl. ¶ 79 (alleging that Goldman Sachs violated

federal securities law, and thus breached the BDA, by "failing to disclose material facts and

misrepresenting that status of the ARS market").  Because Presbyterian's breach of the implied

covenant of good faith and fair dealing claim duplicates its breach of contract claim, the implied

covenant claim must be dismissed.

Presbyterian contends that its implied covenant claim relies on different facts than its breach of contract claim. Opp. at 27. According to Presbyterian, its implied covenant claim is premised on Goldman Sachs's decision to withdraw from the ARS market without warning Presbyterian, while the breach of contract claim is based on Goldman Sachs's failure to disclose the "risks" of the ARS market. Opp. at 27. There are two problems with Presbyterian's argument. First, Presbyterian did rely on Goldman Sachs's decision to withdraw from the ARS market in its breach of contract claim. *See* Amend. Compl. ¶ 83 (alleging that "Goldman also breached its contracts with [Presbyterian] by . . . suddenly and without warning, pull[ing] its bids . . . which was directly contrary to representations Goldman made in presentations to [Presbyterian]"). In other words, even under Presbyterian's view of what its amended complaint alleges, the implied covenant claim is still duplicative of the breach of contract claim.

Second, Goldman Sachs correctly notes that Presbyterian's breach of the implied covenant of good faith and fair dealing allegations do not mention Goldman Sachs's withdrawal from the ARS market. *See* Amend. Compl. ¶¶ 84-85. In its amended complaint, Presbyterian premises its breach of the duty of good faith and fair dealing entirely on Goldman Sachs's failure to disclose the effect its cover bidding had on the ARS market and the deterioration of the ARS market. *Id.* There is no mention of Goldman Sachs's alleged wrongfulness in withdrawing from the ARS market. *See id.* "[T]he Court cannot consider allegations that the plaintiffs raise for the first time in their brief opposing the motion to dismiss because it is axiomatic that a complaint may not be amended by the briefs in opposition to a motion to dismiss.'" *Kiryas Joel All. v. Village of Kiryas Joel*, No. 11 Civ. 3982 (JSR), 2011 WL 5995075, *5 (S.D.N.Y. Nov. 29, 2011) (citation and quotation marks omitted).

The breach of the implied covenant of good faith and fair dealing is accordingly

dismissed.

### D.    The Court Dismisses Presbyterian's Unjust Enrichment Claim

Presbyterian's fourth and final cause of action is an unjust enrichment claim.  According

to Presbyterian, Goldman Sachs unjustly "profited as a result of the collapse of the ARS market."

Amend. Compl. ¶ 86-87.  Presbyterian alleges that Goldman Sachs "profited" by collecting

underwriter and Broker-Dealer fees.  *Id.*  The nonprofit alleges that this profit was "unjust"

because it was Goldman Sachs's "wrongful acts and self-dealing," such as "using false and

misleading statements of material fact[] and/or the omission of material facts," that led

Presbyterian to invest in and then subsequently stay in the ARS market.  Amend. Compl. ¶ 86.

"In order to succeed on a claim for unjust enrichment under New York law, a plaintiff must

prove that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good

conscience militate against permitting defendant to retain what plaintiff is seeking to recover."

*Diesel Props S.r.l. v. Greystone Bus. Credit II LLC*, 631 F.3d 42, 55 (2d Cir. 2011) (citations and

quotation marks omitted).

Like their fraud and breach of contract claims, Presbyterian's unjust enrichment cause of

action is barred by the Second Circuit's ARS precedent.  In *Ashland*, the Second Circuit not only

affirmed the dismissal of the plaintiff-investors' federal securities law and common law fraud

claims, but also their unjust enrichment claim.  652 F.3d at 339.  The Court reasoned that,

because the broker-dealer's disclosures were sufficient to bar the fraud and securities claims, it

was not unjust to permit the broker-dealer to retain its profits.  *Id.*  The same reasoning applies

here.  Because the Court has already concluded that Presbyterian has failed to plausibly state a

fraud or breach of contract claim, Presbyterian's unjust enrichment claim is necessarily

foreclosed. *Id.*; *see also Town of Poughkeepsie v. Espie*, No. 02 Civ. 6995(CLB), 2006 WL 236787, at *2 (S.D.N.Y. Jan. 27, 2006).

For all of the reasons provided above, the Court concludes that all four of Presbyterian's causes of action fail as a matter of law.

### E.      The Statute of Limitations Bars Presbyterian's Fraud and Unjust Enrichment Claims.

In addition to arguing that Presbyterian's causes of action fail to state a claim upon which relief can be granted, Goldman Sachs also contends that Presbyterian's claims are barred by the statute of limitations. Mot. at 20-25. The Court agrees with respect to the fraud and unjust enrichment claims.

### 1.      The Four Year Statute of Limitations for Fraud Has Run

The parties agree as to the legal standards governing the statute of limitations for Presbyterian's fraud claim. For example, the parties agree that that New Mexico's[8] four-year statute of limitations for fraud applies. Mot. at 21; Opp. at 14; *see also Wilde v. Westland Dev. Co., Inc.*, 241 P.3d 628, 635 (N.M. Ct. App. 2010) ("The statute of limitations for causes of action sounding in fraud or conversion is four years from the date that the cause of action accrues."). Additionally, they concur that, because Presbyterian filed its FINRA claims on February 10, 2014, the complaint is untimely if the cause of action accrued earlier than February 10, 2010. Mot. at 21; Opp. at 15; *Presbyterian Healthcare Servs.*, 122 F. Supp. 3d at 1166.

---

[8] In this diversity action, the court must apply the forum state's — i.e., New York's — statute of limitations, including any borrowing statute. *Thea v. Kleinhandler*, 807 F.3d 492, 497 (2d Cir. 2015). "New York's borrowing statute, N.Y. C.P.L.R. 202, provides that when a nonresident plaintiff sues upon a cause of action that arose outside of New York, the court must apply the shorter limitations period, including all relevant tolling provisions, of either: (1) New York; or (2) the state where the cause of action accrued." *Id.* at 497 (quotation marks and citations omitted). New York's statute of limitations for fraud can be longer than New Mexico's. *Compare Wilde v. Westland Dev. Co., Inc.*, 241 P.3d 628, 635 (N.M. Ct. App. 2010), *with Childers v. N.Y. & Presbyterian Hosp.*, 36 F. Supp. 3d 292, 313 n.2 (S.D.N.Y. 2014).

New Mexico uses the "discovery" rule for determining when the statute of limitations begins to run for a fraud claim. *Wilde*, 241 P.3d at 635. Under this rule, a fraud cause of action starts to accrue when the plaintiff discovers "such facts [that] would, on reasonable diligent investigation, lead to knowledge of the fraud or other injury." *Wilde*, 241 P.3d at 635 (alteration omitted) (citation and quotation marks omitted); *see also O'Brien v. Montoya*, No. 34,287, 2016 WL 4368536, at *3 (N.M. Ct. App. July 5, 2016) ("[T]he discovery rule's standard requires knowledge of facts, conditions, or circumstances which would cause a reasonable person to make an inquiry leading to the discovery of the concealed cause of action." (citation and quotation marks omitted)). "The discovery rule carries an affirmative inquiry obligation, which requires a plaintiff to exercise 'reasonable diligence' in discovering a claim." *O'Brien*, 2016 WL 4368536, at *3; *see also Wilde*, 241 P.3d at 635. In New Mexico, a fraud cause of action begins to accrue as soon as the plaintiff knows the facts triggering a duty to investigate, regardless of whether plaintiff realizes that he has a viable legal cause of action. *O'Brien*, 2016 WL 4368536, at *3.

As applied here, Presbyterian was aware of at least three facts before February 10, 2010 that triggered the nonprofit's obligation to investigate their fraud claim. First, the SEC's May 31, 2006 order put Presbyterian on notice of a potential fraud claim. That order, which was publicly available, concluded that several broker-dealers, including Goldman Sachs, had violated federal securities law through their actions in the ARS market. *Wilson*, 671 F.3d at 125; *Anschutz*, 690 F.3d at 103. Second, pursuant to the SEC's Order, Goldman Sachs sent Presbyterian a new set of disclosures in 2006. Amend. Compl. ¶ 42 n.4; 2006 SEC Order at 11; Def. Ex. 11. Third, the ARS market crashed, and Presbyterian was injured, in late 2007 and early 2008. Amend. Compl. ¶¶ 64, 66, 68; *Anschutz*, 690 F.3d at 102, 105. According to

Presbyterian, they lost approximately $10,000,000 during the crash. Amend. Compl. ¶ 11. In light of the crash of the ARS market and this large financial loss, a reasonable entity in Presbyterian's shoes would have started investigating the possible causes of the injury, such as fraud on the part of the nonprofit's broker-dealer.

The Court's conclusion that Presbyterian was on "inquiry" notice before February 10, 2010 is further supported by precedent. As mentioned previously, there have been many lawsuits in this Circuit challenging the actions of broker-dealers in the ARS market. Many of these lawsuits were commenced years before Presbyterian filed its 2014 claims, and some of the lawsuits were even filed before the date Presbyterian claims their fraud claim accrued. *See, e.g.*, *Wilson*, 671 F.3d at 126 (two complaints filed in March 2008); *Ashland*, 652 F.3d at 336 (complaint filed in June 2009); *In re: JP Morgan Auction Rate Sec. (ARS) Mktg. Litig.*, 717 F. Supp. 2d 1374, 1376 (J.P.M.L. 2010) (five ARS lawsuits filed in 2009 and 2010). The fact that so many that other entities in Presbyterian's position discovered their claims years before Presbyterian filed its claims supports the Court's conclusion that the nonprofit did not act diligently in investigating its potential fraud claim.

Presbyterian has two main responses to this conclusion. First, Presbyterian argues that the Court should not resolve the statute of limitations question in a motion to dismiss, as the question of whether the nonprofit acted "reasonably" in investigating its claims is a question for a jury. Opp. at 15. However, "[i]t is well established . . . that 'a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint.'" *Wechsler v. HSBC Bank USA, N.A.*, No. 15-CV-5907 (JMF), 2016 WL 1688012, at *2 (S.D.N.Y. Apr. 26, 2016) (quoting *Ellul v. Congregation of Christian Bros.*, 774 F.3d 791, 798 n.12 (2d Cir. 2014)); *see also Marquez v. N.M. Behavioral Health Institute*, No. 33,132, 2013 WL

29

7752630, at *1 (N.M. Ct. App. Dec. 16, 2013). Here, the facts demonstrating that Presbyterian's fraud claim is time-barred — the 2006 SEC Order, Goldman Sachs's disclosures pursuant to that Order, and the collapse of the ARS market leading to Presbyterian's financial injury — are all found on the face of Presbyterian's complaint. *See* Amend. Compl. ¶¶ 11, 42 n.4, 60, 64, 66.

Second, Presbyterian contends that the statute of limitations should be tolled because Goldman Sachs attempted to hide its fraudulent behavior in the aftermath of the ARS market. Opp. at 15. A defendant's misrepresentations or fraudulent concealment can toll the statute of limitations. *See Wilde*, 241 P.3d at 636-37; *Keithley v. St. Joseph's Hosp.*, 698 P.2d 435, 439 (N.M. 1984). However, Presbyterian's contention that Goldman Sachs's "obfuscate[d] the true reasons behind the collapse of the ARS market" cannot be squared with publicly available information, including the 2006 SEC Order and the general prevalence of newspaper articles discussing the collapse of the ARS market. *See* Mot. Appendix A (listing "News Articles Describing the February 2008 Dislocation of the Auction Rate Securities Market"); *see also Gluck v. Amicor, Inc.*, 487 F. Supp. 608, 614 (S.D.N.Y. 1980) (concluding that the statute of limitations had begun to run in light of an SEC investigation and contemporaneous newspapers); *Williams v. Stewart*, 112 P.3d 281, 285-86 (N.M. 2005) (collecting cases for the proposition that newspaper reports can put a plaintiff on inquiry notice).

For these reasons, the Court concludes that Presbyterian's fraud claim is barred by the statute of limitations.

### 2.    The Statute of Limitations Also Bars the Unjust Enrichment Claim

Unlike with the fraud claim, the parties dispute the statute of limitations applicable to Presbyterian's unjust enrichment clam. Goldman Sachs contends the limitations period is four years. Mot. at 25. Presbyterian argues the period is six years. Opp. at 30. According to

Presbyterian, the statute of limitations for unjust enrichment in New Mexico "depends on and follows the underlying claim." Opp. at 30. Here, according to Presbyterian, the unjust enrichment claim is "predicated on the Broker-Dealer agreement," meaning that New Mexico's six year statute of limitations for breach of contract should apply. *Id.*

The Court concludes that the relevant limitations period is four years. Contrary to Presbyterian's position, several cases applying New Mexico law have identified the limitations period as four years. *See Sweesy v. Sun Life Assurance Co.*, 643 F. App'x 785, 786, 790 (10th Cir. 2016); *Kysar v. Amoco Prod. Co.*, 379 F.3d 1150, 1157 (10th Cir. 2004); *Salazar v. Indymac Bank, F.S.B.*, No. 12cv1182 MCA/RHS, 2013 WL 11955290, at *10 (D.N.M. Feb. 28, 2013). [9] Additionally, Presbyterian misunderstands the nature of an unjust enrichment claim. An unjust enrichment claim is a "quasi-contract" claim that exists only in the absence of an express contract. *See Salazar*, 2013 WL 11955290, at *10 ("[T]he claim for unjust enrichment is associated with unwritten or implied contracts."). Thus, it cannot be "predicated on the Broker-Dealer" agreement, as Presbyterian claims. New Mexico applies a four year statute of limitations period to quasi-contract claims. N.M. Stat. Ann. § 37-1-4.

Presbyterian's unjust enrichment claim is based on the same facts underlying the nonprofit's fraud claim. Thus, for the same reasons that Presbyterian's fraud claim is barred by a four-year statute of limitations, the unjust enrichment claim is also barred.

---

[9] New Mexico's statute of limitations for unjust enrichment is shorter than New York's. *Compare Kysar*, 379 F.3d at 1157 (noting that a "four-year statute of limitations" applies to unjust enrichment claims in New Mexico), *with Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 518 (2d Cir. 2001) ("The statute of limitations in New York for claims of unjust enrichment . . . is generally six years."). Under New York's borrowing statute, New Mexico's limitations period therefore applies. *See Thea*, 807 F.3d at 497.

### 3.    The Statute of Limitations Probably Does Not Bar Presbyterian's Breach of Contract Claim

Goldman Sachs also argues that Presbyterian's breach of contract and breach of the implied duty of good faith claims are barred by the statute of limitations. Mot. at 24-25. Although Goldman Sachs recognizes that the limitations period for breach of contract claims in New Mexico is six years, Goldman Sachs argues that the "true nature" of Presbyterian's claim is fraud, so the four year limitations period should apply. *Id.* The Court agrees with Goldman Sachs that a court "must determine the true nature of a claim in order to prevent parties from avoiding the shorter tort limitation period." *Badilla v. Wal-Mart Stores East Inc.*, 357 P.3d 936, 948 (N.M. 2015). However, the Court is skeptical of Goldman Sachs's argument that the "true nature" of Presbyterian's breach of contract claim is a fraud claim. "[T]he difference between a tort and contract action is that a breach of contract is a failure of performance of a duty arising or imposed by agreement; whereas, a tort is a violation of a duty imposed by law." *Kreischer v. Armijo*, 884 P.2d 827, 829 (N.M. 1994). Here, Goldman Sachs's duty to avoid acting fraudulently was imposed *both* "by agreement," *see* Def. Ex. 4, and "by law," *see Wilson*, 671 F.3d at 129-31. This suggests that Presbyterian's alleged facts can legitimately sound in both tort and contract, meaning that even if the tort statute of limitations has passed, a breach of contract claim can remain viable. The Court need not definitively resolve this issue, however, in light of its earlier determination that Presbyterian's breach of contract cause of action should be dismissed anyway for failure to state a claim.

## IV.    Conclusion

For the aforementioned reasons, the Court grants Goldman Sachs's motion to dismiss the amended complaint in its entirety. All four of Presbyterian's causes of action fail to state a claim upon which relief can be granted, and at least two of them are barred by the statute of limitations.

The dismissal is with prejudice.

This resolves Docket Number 62.  The Clerk of the Court is directed to close the case.


SO ORDERED.

Dated:  _March 16_, 2017
      New York, New York

_____
ALISON J. NATHAN
United States District Judge